**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

ATUL BISARIA,                                                    CIVIL DIVISION
Individually,
          Plaintiff,


vs.                                                                      CASE NO:


HTL (HILTON) EXISTING
FRANCHISE HOLDING, LLC, d/b/a
HILTON HOTELS CORPORATION,
A DELAWARE LIMITED LIABILITY
CORPORATION, BLACKROCK
FINANCIAL MANAGEMENT, INC.,
A NEW YORK CORPORATION, AND
REED SMITH, LLP, A DELAWARE
LIMITED LIABILITY
PARTNERSHIP,

          Defendants.
_____/

## COMPLAINT

     PLAINTIFF, ATUL BISARIA, individually, by and through undersigned counsel hereby

files his Complaint against HTL (HILTON) EXISTING FRANCHISE HOLDING, LLC, d/b/a

HILTON HOTELS CORPORATION, (hereinafter "HILTON") A DELAWARE LIMITED

LIABILITY CORPORATION, BLACKROCK FINANCIAL MANAGEMENT, INC.,

(hereinafter "BLACKROCK") A NEW YORK CORPORATION, REED SMITH, LLP A

DELAWARE LIMITED LIABILITY PARTNERSHIP (hereinafter "REED SMITH") and

further states:

*Case No.*
*BISARIA v. HILTON, et.al.*
*Complaint*

## THE PARTIES JURISDICTION AND VENUE

1.    BISARIA is an individual residing as an individual, and a citizen of the State of Florida and otherwise *sui juris*.

2.    HILTON: Hilton is a Delaware Limited Liability Company with its corporate citizenship based in Virginia.

3.    BLACKROCK: BLACKROCK is a New York corporation with its corporate citizenship in New York.

4.    REED SMITH: REED SMITH is a Delaware Limited Liability Partnership with its principle place of business in Pennsylvania for jurisdictional purposes.

5.    JURISDICTION BASED UPON DIVERSITY OF CITIZENSHIP: Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332.

6.    VENUE: Venue is proper herein as the alleged breaches articulated occurred in the Southern District of Florida.

## THE HOTEL HISTORY & BISARIA ACQUISITION

7.    PITTSBURGH'S Historic Hotel Property:  Conrad Hilton, the founder of the Hilton hotel franchise giant, built the Pittsburgh Hilton in 1959, one of his first hotels.  This landmark property, located on the Pointe of the Three Rivers, was and remains the signature property of downtown Pittsburgh.  The property is located in the Gateway Center, in the middle of downtown, and consists of 22 stories, 713 guest rooms, and approximately 50,000 square feet of conference room space.  The property has a storied history and most recently hosted the G8 Economic Summit in September, 2009.

2

8.     <u>BISARIA an Experience Hotel Owner and Operator</u>: Bisaria is an experienced hotelier, in the industry for 27 years, and engages in hotel activities throughout the United States including current properties: the Marriot Cornhusker in Lincoln, Nebraska; his facilities in Cincinnati Ohio; The Crowne Plaza, Detroit, Michigan; and Boca Raton, Florida (formerly the DoubleTree).   Bisaria's experience, knowledge, and success made him the ideal Hilton franchisee.   BISARIA's prior hotel properties include: The Sheraton Hartford; The Hilton, Greensborough; Holiday Inn, Montevail, New Jersey; the Sheraton, Lowell, Massachusetts; Holiday Inn, Fort Lauderdale; Holiday Inn, Miami North; and the Four Points, Pompano Beach, Florida.

### <u>THE HILTON ACQUISITION AND OVERVIEW OF RENOVATIONS</u>

9.     <u>BISARIA Acquires The Pittsburgh Hilton</u>:   BISARIA formed a single purpose entity, Shubh Hotels, Pittsburgh, LLC, (hereinafter Shubh Pittsburgh) a Florida Limited Liability Company, for the express purpose of acquiring the Pittsburgh Hilton directly from HILTON and Hertz.   BISARIA's purchase occurred on May 19th, 2006 for 35.7 Million dollars ($35,700,000.00), with a commitment to renovate the hotel with an additional Seven Million ($7,000.000.00) of renovations, upgrades and other improvements; a substantial portion of these funds were BISARIA owner's equity.   Credit Suisse provided the acquisition funding and construction financing.  BISARIA identified the property through a broker and acquired the asset after six months of negotiations.

10.     <u>Hotel Property in Disrepair</u>: At the time of acquisition, the Pittsburgh Hilton was in a state of disrepair, with HILTON's failure to maintain the property to its own standards, as

identified in Paragraph 22 below.  In addition, once Shubh Pittsburgh commenced the required renovations, Shubh Pittsburgh discovered asbestos behind the bathroom walls on the pipes, but never disclosed, in contravention of the express warranties and representations in the Contract for Purchase and Sale (Exhibit A).

11.    BISARIA Personal Investment in Hotel and Property:  At the time of acquisition, BISARIA committed in excess of Three Million Dollars ($3,000,000) of his own funds, and that number only grew over time to exceed Twenty Three Million Dollars ($23,000,000.00).

12.    BISARIA Was Shubh Pittsburgh:  Other than Credit Suisse's contribution, BISARIA solely funded the acquisition and BISARIA and his immediate family were the sole members of Shubh Pittsburgh.

13.    HILTON Franchise Agreement:  As part of the transaction, BISARIA, through Shubh Pittsburgh, entered into a franchise arrangement with HILTON.  A copy of the Franchise Agreement is attached as Exhibit B.  Prior to obtaining the property and becoming a franchisee, BISARIA was qualified by HILTON; this was not an issue, as BISARIA already owned a HILTON branded franchise in the name of the Boca DoubleTree.

14.    The Expansion:  Immediately upon acquiring the Pittsburgh Hilton, Shubh Pittsburgh commenced the renovations and other improvements.  While undertaking the improvements, Shubh Pittsburgh decided to expand the convention space, requiring additional construction funding.

*Case No.*
*BISARIA v. HILTON, et.al.*
*Complaint*

15.    Cost Overruns:  In addition to the expansion, Shubh Pittsburgh experienced cost overruns on its renovations, upgrades, and refurbishing of the hotel property, as well as the added expense of the asbestos and other unanticipated challenges.

16.    BISARIA Refinances Pittsburgh Facilities With Column Financial:  On August 17, 2007, BISARIA refinanced and increased the debt facilities for the Pittsburg Hilton expansion with Column Financial Inc. Exhibit C.  This increased the total debt to FOURTY NINE MILLION, SIX HUNDRED THOUSAND DOLLARS ($49,600,000.00)

17.    Column Financial Assigns Debt To BLACKROCK:  BLACKROCK acquired the Column Financial loan facility, including the first mortgage on the property.  A copy of the BLACKROCK assignment is attached as Exhibit D.

18.    Total Cost of Expansion and Renovation Exceeds Thirty Million Dollars:  Over the course of the past four years, between the convention expansion, asbestos removal, and the hotel property renovations, the total cost of capital improvements to the Pittsburgh property exceeded Thirty Million Dollars ($30,000,000.00).


**SHUBH'S OPERATIONS AND HILTON'S CONTINUOUS ATTEMPTS TO**

**REACQUIRE PITTSBURGH HILTON**

19.    Shubh's Plans Thwarted by HILTON and BLACKROCK:  From commencement of operations, and in conjunction with BLACKROCK's arrival on scene, HILTON and BLACKROCK conspired to defeat Shubh Pittsburgh's operations and success.  HILTON and

BLACKROCK, have in other court proceedings, conceded the existence of an agreement to eject Shubh Pittsburg and BISARIA from ownership and to restore HILTON to its franchise property.

20.     <u>From Inception Of Franchise Relationship, HILTON Works to Fail Shubh Pittsburgh</u>:  Almost immediately upon acquisition, BISARIA and Shubh Pittsburgh found itself facing HITLON's declarations of default, with HILTON setting up Shubh Pittsburgh for failure.

21.     <u>Initial Default before BISARIA's Acquisition</u>:     Illustrative of HILTON's continuous malfeasance and bad faith, HILTON declared a default in the SALT scores, a measure of how the franchisee performs, in August, 2006.  That default claimed that Shubh Pittsburg was in default for previous six months; a time period which included HILTON's own ownership of the facility.

22.     <u>HILTON Transfers Key Personnel</u>:  After acquisition, HILTON removed key personnel from the day to day management of the property, including the General Manager, the Food and Beverage Director, the Executive Chef, the Banquet Manager, the Front Office Manager, the Executive Housekeeper, the Director of Marketing and Sales, and other mid-level associates.

23.     <u>Financial Covenant Defaults Cured</u>:  During the most recent economic crisis which commenced September, 2008, Shubh Pittsburgh did have difficulties meeting some of its financial obligations, including its franchise fees.  However, Shubh Pittsburgh cured all financial defaults, and no financial defaults existed at the time Hilton terminated its franchise relationship with Shubh.

24.    <u>The Mid-January Conference Call</u>:   Together with BLACKROCK and their respective counsels, BISARIA held a conference call on January 13th, 2010.  This call resulted in the First Amendment to Loan Agreement with BLACKROCK (Exhibit E) and HILTON withdrawing its declarations of default.  The issues discussed included:

    a. Shubh Pittsburgh's financial defaults, which included the promise to cure by February, 2010.  These defaults were cured in full, by BISARIA personally borrowing and injecting those funds;

    b. HILTON agreed to permit Shubh Pittsburgh to complete the renovations through August 23rd, 2010, allowing the continued status as PIP (Property Improvement Plantime) so that there were no non-financial covenant defaults;

    c. HILTON and BLACKROCK insisted that Shubh Pittsburgh turn over day to day management control to an approved management company.  HILTON recommended itself as the approved management company;

    d. BLACKROCK insisted BISARIA contribute additional Two Million, One Hundred Thousand Dollars ($2,100,000.00), which BISARIA borrowed and contributed immediately.  Subsequently, BISARIA disclosed that he borrowed these and additional funds from third parties.

25.    <u>Shubh Pittsburgh Hires CRESCENT as Management Company</u>:  On March 15th, 2010, Shubh Pittsburgh turned over day to day operations to CRESCENT.  Both BLACKROCK and HILTON approved CRESCENT's retention.

## BLACKROCK CONTROLS SHUBH PITTSBURGH DISBURSMENTS

## THROUGH REED SMITH

26.   <u>BLACKROCK Assumed Control of Operating Funds</u>:  After the January meeting, based upon the First Amendment, BLACKROCK required an operating budget from Shubh Pittsburgh.  They approved Shubh Pittsburgh's monthly operating budget and released funds from a lockbox only for approved expenses.

27.   <u>Cash Flow Improves but BLACKROCK Seizes Profits</u>:  As a northern hotel property, hotels overrun their budgets in the winter months, and as the weather improves, so do receipts.  Shubh Pittsburgh was no different: For the first four months of 2010, it ran over budget and made up the difference by BISARIA borrowing the funds and injecting them into the company.  Cash Flow improved in the spring, with excess revenues coming in to the Shubh Pittsburgh operating account.  When March and April receipts came into the operating account in May, they exceeded the budgeted expenses. However, BLACKROCK seized the excess funds, even though Shubh Pittsburgh was current in its obligations to BLACKROCK, and those funds included Pennsylvania State and local Sales and Use Tax.

28.   <u>BLACKROCK, Through REED SMITH, Withholds Sales Tax Receipts</u>:  Despite demand by Shubh Pittsburgh, BLACKROCK refused to release the excess funds necessary to meet state and local tax obligations.  BLACKROCK purportedly refused to release these funds as state and local sales tax was not identified as a line item operating expense in the budget; this was omitted from the operating budget as the sales tax is a trust fund item, not listed as an expense.

*Case No.*
*BISARIA v. HILTON, et.al.*
*Complaint*

29.   <u>BLACKROCK Refuses Renovation and Reserve Requests</u>:  During this period, BLACKROCK refused to release funds necessary to finalize the renovations and to funds the draw request from the FF&E (Furniture, Fixtures & Equipment) Reserve, interfering with Shubh Pittsburgh's ability to meet the property renovation time table and causing further defaults with HILTON.

30.   <u>REED SMITH Holds Funds Hostage</u>:   As REED SMITH served as BLACKROCK's counsel, they interfaced with Shubh Pittsburgh on the issues concerning release of the excess funds. REED SMITH refused to release budgeted items until REED SMITH was paid its attorney fees, on the same day that they submitted their bill and even though their fee bill was not part of the operating budget. REED SMITH's legal fees, while unaudited prior to payment, exceeded all reasonable measurements for attorneys' fees.  REED SMITH also declared Shubh Pittsburgh in default on behalf of BLACKROCK, for not submitting an operating budget, an absurdity, when REED SMITH was holding funds pursuant to the approved budget; they charged fees for this as well.

31.   <u>REED SMITH and BLACKROCK Communicate Directly With CRESCENT</u>: Contrary to BISARIA express instructions, the lender BLACKROCK, through its counsel REED SMITH, obtained confidential operating information directly from CRESCENT.  CRESCENT provided that information without notifying BISARIA.

32.   <u>Decline in Scores Immediately Upon Management Assumption of Daily Responsibilities</u>:  Immediately, with CRESCENT in charge, Shubh Pittsburgh's SALT scores dramatically declined, rather than increase.  In April, 2010, the QA (Quality Assurance), the

9

cleanliness drops from 100% in the prior inspection under Shubh Pittsburgh management, to thirteen percent (13%), under CRESCENT management.

33.  <u>BISARIA Expresses Concerns to HILTON</u>:  Following the decline in SALT and Cleanliness scores, BISARIA expressed his growing concerns to HILTON's officers, Dave Horton and Mike Williams.   BISARIA requested a change of management in those conversations.

34.  <u>HILTON Orders Surprise Inspection on July 30th</u>:  Although normally twice a year, HILTON issued a new QA inspection on July 30th, 2010, in which the cleanliness scores appreciate considerably, but HILTON fails Shubh Pittsburg for not completing the renovations, in contradiction with the January 13th agreement.  HILTON demands that Shubh Pittsburgh cure within thirty days.

35.  <u>BISARIA Meets with HILTON in Washington Office</u>:   Upon notification of failure of the report, BISARIA immediately calls for a meeting with HILTON representatives and is granted a meeting in HILTON's Washington, DC headquarters.   At the meeting, HILTON's representatives advise BISARIA that if he cures all failures, marked by an "X" by September 30th, 2010, then HILTON will not terminate the franchise agreement.  During that meeting, HILTON encourages BISARIA to continue to work with CRESCENT.  Even with that news, BISARIA complains of the failing SALT scores, but HILTON assuages BISARIA by explaining that CRESCENT SALT scores at the other properties are in compliance.  HILTON assures BISARIA, and his consultant Jai Lalwani, that should the PIP be completed, HILTON, will not terminate its franchise relationship.

36.   <u>BISARIA Completes All Renovations Under His Control</u>:  BISARIA completed all of the required items by August 30th, except three items which were HILTON controlled. Those three items were procuring two waiver letters from HILTON itself and the high speed internet access, which was paid for, but not delivered by HILTON's vendor.

## TERMINATING CRESCENT COMMENCES FINAL ACT

37.   <u>CRESCENT Opposes Termination</u>: CRESCENT, in a series of conversations with BISARIA, assured BISARIA that neither HILTON, nor BLACKROCK, would terminate their respective relationships as long as CRESCENT remained as operations manager.

38.   <u>Shub Pittsburgh Terminates CRESCENT July 23rd, 2010</u>: Shubh Pittsburgh terminates CRESCENT July 23rd, 2010; BLACKROCK seeks to impose CRESCENT to stay in Pennsylvania state court, even when Shub Pittsburgh insisted otherwise.  The state court allowed CRESCENT to remain through August 23, 2010.

39.   <u>HILTON Terminates Franchise Relationship</u>:   Contrary to their express representations in the Washington meeting, on September 1, 2010, HILTON terminated its franchise relationship with Shubh Pittsburgh.  <u>Exhibit F</u>.

40.   <u>HILTON Maintains Facade of Pittsburg Hilton</u>:  Despite the termination of the relationship, HILTON continues to market the property as if it were flagged as a HILTON franchise.

11

*Case No.*
*BISARIA v. HILTON, et.al.*
*Complaint*

**HILTON AND BLACKROCK COLLUDE TO REMOVE SHUBH PITTSBURG AND
BISARIA**

41.    The HILTON-BLACKROCK Plan:   As set forth in particular detail below
BLACKROCK and HILTON coordinated their efforts in declaring defaults, terminating their
agreements, moving against Shubh Pittsburgh's interest, with assurances that each will be
reinstated.   This coordinated action was contrary to Shubh's and BISARIA's interests and
designed to defeat those interests without consideration of their investment in the property.

42.    HILTON's Misrepresentations to BISARIA:   HILTON made the following
misrepresentations to BISARIA:

     a. PIP Status:    HILTON represented to BISARIA that the Shubh Pittsburgh
property  would maintain its PIP Status while repairs were underway and no
longer be considered an event of default;

     b. Management:  HILTON represented to BISARIA that he could select
management providers and replace Crescent with another management company.

43.    The Coordinated Default:  HILTON and BLACKROCK conspired to force Shubh
Pittsburgh into a covenant default, declare the default, and attempt to eject BISARIA.  In the
absence of a financial covenant default, as Shubh Pittsburgh was current on all payments to
HILTON and BLACKROCK, both HILTON and BLACKROCK contrived other performance
covenant defaults to eject Shubh Pittsburgh and BISARIA. This script is exactly what they did:

     a.  HILTON claimed a default in the renovation project when all items were
complete, except for the issuance of releases from HILTON itself; Exhibit G

12

b.  HILTON terminated its franchise agreement declaring Shubh Pittsburgh in violation of its covenants to renovate the property.  <u>Exhibit H</u>

c.  BLACKROCK declared a default a default under the mortgage documents with the loss of the franchise agreement.  <u>Exhibit I</u>

d.  Unbeknownst to BISARIA and Shubh Pittsburgh, an agreement existed between BLACKROCK and HILTON, that upon ejection of BISARIA and Shubh Pittsburgh, HILTON would return to the property and "re-flag it" as a HILTON property.  HILTON's expectation to return to the property is evidenced in its motion to enjoin Shubh Pittsburgh from re-flagging the property; why would HILTON, after terminating its franchise relationship, seek to enjoin Shubh Pittsburgh from entering into a franchise relationship with Wyndham if not to retain the property for itself.

**COUNT I: HILTON**

BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

Bisaria adopts a realleges paragraphs 1 through 44 as fully set forth herein and further states:

44.  <u>Summary of Claim</u>:  This is an action for breach the implied covenant good faith and fair dealing against HILTON under the Franchise Agreement as HILTON declared its default solely for purposes of giving BLACKROCK a basis by which to foreclose its mortgage and seek to exclude BISARIA and SHUBH Pittsburgh from management.

45.   <u>Breach From an Expressed Covenant</u>: As detailed above, HILTON breached its expressed representations to BISARIA to treat the property as PIP, property in progress, and not to declare a default under the Franchise Agreement.  Although Shubh Pittsburgh completed all required repairs, and the only remaining items were releases from HILTON itself, HILTON declared a default under the Franchise Agreement and terminated the same at a time when Shubh Pittsburgh was not in default of any financial covenant.

46.   <u>Breach of The Implied Covenant of Good Faith and Fair Dealing</u>:  HILTON breached its implied covenant and good faith and fair dealing in intentionally declaring Shubh Pittsburgh in default of the Franchise Agreement when Shubh Pittsburgh complied with all written franchise obligations, complied with all verbal requests, and addressed each complaint raised by HILTON.  HILTON breached the implied covenant of good faith by:

      a.  Negating on its verbal and written commitments to treat Shubh Pittsburgh as no longer in default should it comply with all of these requirements;

      b.  Terminating the Franchise Agreement so as to cause a default in Shubh Pittsburgh's Mortgage and Loan Agreement with BLACKROCK at a time when HILTON never intended to leave the property.

47.   <u>Damages</u>:  As a result of HILTON'S breach, BISARIA is damaged.

48.   <u>Causation</u>:   As of a result of HILTON'S breach, HILTON caused BISARIA damages.

49.   <u>Attorneys' Fees</u>:   BISARIA is entitled to his attorneys' fees pursuant to the Franchise Agreement and other corporate documents.

*Case No.*
*BISARIA v. HILTON, et.al.*
*Complaint*

WHEREFORE, BISARIA demands judgment for damages, prejudgment interests, court cost, and attorneys' fees against HILTON, granting any and all further such relief as this Court may deem appropriate.

## COUNT II: BLACKROCK

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

BISARIA adopts a realleges paragraphs 1 through 44 as fully set forth herein and further states:

50.   <u>Summary of Claim</u>:   BISARIA brings this action against BLACKROCK for breach of its implied covenant of good faith and fair dealing.  As BLACKROCK encouraged HILTON and assured HILTON that if it terminated its franchise agreement, it would reinstall Hilton upon its foreclosure of Shubh and in effect worked against Shubh Pittsburgh and BISARIA the borrower and guarantor of its obligation, and further seeks additional relief as this Court may deem appropriate.

51.   <u>Breach of The Loan Agreement</u>:   BLACKROCK breached the terms of its own loan agreement with Shubh Pittsburgh in as much as it encouraged HILTON to declare a default in HILTON'S Franchise Agreement.

52.   <u>Breach of The Implied Covenant of Good Faith and Fair Dealing</u>:   In reaching it agreement with HILTON, BLACKROCK breached its implied covenant of good faith and fair dealing with Shubh Pittsburgh and BISARIA.

15

53.   <u>Damages</u>:  As of a result of BLACKROCK'S breach of its implied covenant of good faith and fair dealing, BISARIA is damaged.

54.   <u>Causation</u>: But for BLACKROCK'S breach of its implied covenant of good faith and fair dealing, BISARIA would not have suffered damages.

55.   <u>Attorneys' Fees</u>:  BISARIA is entitled to his attorneys' fees as set forth in the loan documents and other applicable provisions.

WHEREFORE, BISARIA demands judgment for damages against BLACKROCK, prejudgment interests, court costs, attorneys' fees and for any and all further such relief as this Court may deem appropriate.


**COUNT III: AS TO BLACKROCK AND HILTON**

TORTUOUS INTERFERENCE WITH ADVANTAGES BUSINESS RELATIONSHIPS

BISARIA adopts a realleges paragraphs 1 through 44 as fully set forth herein and further states:

56.   <u>Summary of Claim</u>:  BISARIA sues HILTON and BLACKROCK for tortuous interference with his advantages business relationship with each of the respective defendants as they conspired to defeat their contractual obligations to BISARIA, seeking damages and further relief.

57.   <u>BLACKROCK'S Tortuous Interference With Bisaria And Shubh Pittsburgh's Relationship With HILTON</u>:  BLACKROCK tortuously interfered with BISARIA'S and Shubh Pittsburgh's existing business relationship with HILTON when it encouraged HILTON to

declare Shubh Pittsburgh in default, terminate it relationship, and that HILTON would be assured of regaining its franchise relationship with the property.

58.   <u>HILTON'S Tortuous Interference With Bisaria and Shubh Pittsburgh's Relationship With BLACKROCK</u>:  HILTON tortuously interfered with BISARIA'S and Shubh Pittsburgh's business relationship with BLACKROCK in as much as HILTON agreed to terminate its contact for the purpose of having Shubh Pittsburgh and BISARIA declared in default of their relationship with BLACKROCK.  HILTON'S agreement with BLACKROCK encouraged BLACKROCK to breach its relationship with Shubh Pittsburgh and BISARIA.

59.   <u>Damages</u>:  As a result of HILTON'S conduct, BISARIA is damaged.

60.   <u>Causation</u>:  But for HILTON'S conduct, BISARIA'S relationship with BLACKROCK would not have been breached and HILTON caused the breach of that relationship.

61.   <u>Not Privileged To Interfere</u>:  HILTON'S conduct was not privileged by any legitimate economic interests.

62.   <u>Not Privileged To Interfere</u>:  BLACKROCK'S tortuous interference was not privileged by any legitimate economic interests.

63.   <u>Attorneys' Fees</u>:  BISARIA is entitled to his attorneys' fees pursuant to the loan documents and other bases of law and seeks recovery of the same herein.

WHEREFORE, BISARIA demands judgment against BLACKROCK and HILTON, prejudgment interests, court costs, attorneys' fees and for any and all further such relief as this Court may deem appropriate.

17

## COUNT VI: REED SMITH

TORTUOUS INTERFERENCE WITH ADVANTAGES BUSINESS RELATIONSHIPS:

BISARIA adopts a realleges paragraphs 1 through 44 as fully set forth herein and further states:

64.   <u>Summary of Claim</u>:  This is an action for damages against REED SMITH for tortuously interfering with BISARIA'S advantages business relationships with creditors and other business entities doing business with Shubh Pittsburgh and for other relief.

65.   <u>REED SMITH'S Tortuous Interference</u>:  REED SMITH tortuously interfered with Shubh Pittsburgh and BISARIA'S business relationships with its creditors and other third party businesses by holding legitimate funds for disbursements under the BLACKROCK Loan documents hostage until BISARIA paid REED SMITH'S unaudited attorneys' fees.

66.   <u>Damages</u>: REED SMITH'S conduct caused Bisaria damages.

67.   <u>Causation</u>: But for REED SMITH'S tortuous interference, Bisaria would not have been damaged.

68.   <u>No Privilege For Interference</u>: REED SMITH did not have an economic privileged by withholding BLACKROCK'S funds from Shubh Pittsburgh and BISARIA.

WHEREFORE, BISARIA demands judgment against REED SMITH, prejudgment interests, court costs, attorneys' fees and for any and all further such relief as this Court may deem appropriate.

### DEMAND FOR JURY TRIAL

BISARIA DEMANDS A TRIAL BY JURY FOR ALL SUCH CLAIMS SO TRIABLE BY LAW.

Dated this 14th of October, 2010.

Respectfully submitted,

**GRUMER & MACALUSO, P.A.**
Attorneys for Plaintiff
One East Broward Boulevard
Suite 1501
Ft. Lauderdale, Florida 33301
(954) 713-2700
(954) 713-2713 Fax
kgrumer@grumerlaw.com

By:  *Keith T. Grumer, Esq.*
KEITH T. GRUMER, ESQ.
FL. Bar No: 504416

*Case No.*
*BISARIA v. HILTON, et.al.*
*Complaint*

# <u>EXHIBITS</u>

A       Agreement of Purchase and Sale

B.      Hilton Franchise Lease Agreement

C.      Column Financial Debt

D.      Assignment to BlackRock

E.      First Amendment to Loan Agreement

F.      Hilton Termination of Franchise Agreement

G.      ReedSmith Correspondence, Events of Default (June 28, 2010)

H.      ReedSmith Correspondence, (August 5, 2010)

I.      ReedSmith Correspondence, (July 20, 2010)